UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANTAE WRIGHT, o/b/o A.B.W.,

                    Plaintiff,          Civil Action No. 12-13564
                                        Honorable Julian Abele Cook
                                        Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 14]

Plaintiff Shantae Wright ("Plaintiff") brings this action on behalf of her minor son, A.B.W., pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying A.B.W.'s application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [13, 14], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.     RECOMMENDATION

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that A.B.W. is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Plaintiff's Motion for Summary Judgment [13] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

A.     **Procedural History**

On February 27, 2009, an application for SSI was filed on behalf of A.B.W., alleging a disability onset date of November 1, 2008.  (Tr. 94-97).  This application was denied initially on June 22, 2009.  (Tr. 69-72).  A timely request for an administrative hearing was filed on A.B.W.'s behalf, and a hearing was held on August 4, 2010, before ALJ Timothy Scallen.  (Tr. 38-67).  Both A.B.W. and Plaintiff (his mother) appeared and testified at the hearing, represented by attorney Cynthia Young.  (*Id.*).  On November 23, 2010, the ALJ issued a written decision finding that A.B.W. is not disabled.  (Tr. 9-23).  On June 5, 2012, the Appeals Council denied review.  (Tr. 1-5).  On behalf of A.B.W., Plaintiff filed for judicial review of the final decision on August 10, 2012.  (Doc. #1).

B.     **Background**

1.     *Disability Reports*

A.B.W. was born in July of 1996, making him twelve years old at the time his application for SSI was filed.  (Tr. 102).  In an undated disability report, Plaintiff reported that A.B.W. was five feet tall and weighed 174 pounds (by the time of the hearing, A.B.W. was 5' 6" tall and weighed 240 pounds).  (Tr. 51, 105).  According to Plaintiff, A.B.W. suffers from sleep apnea, hearing loss, and "behavioral problems," and first became disabled on November 1, 2008.  (Tr. 106).  Plaintiff indicated that A.B.W. received testing and medication for his sleep apnea and hearing loss at Children's Hospital of Michigan.  (*Id.*).  At the time of the report, A.B.W. was using a "breathing machine" for his sleep apnea and was taking Claritin.  (Tr. 107).  He did not experience any side effects from these medications/treatments.  (*Id.*).  A.B.W. had undergone a hearing test (in October 2008) and a sleep study (in November 2008).  (Tr. 108).  At the time of the report, A.B.W. was in the seventh grade, and was not taking special education classes.  (Tr.

2

109).  In summary, Plaintiff said:  "[A.B.W.] has been having behavioral problems in school. His doctor … wonders if it could all stem from his inability to hear and grumpiness due to not being able to sleep."  (Tr. 110).

In a March 23, 2009 daily activities report, Plaintiff indicated that A.B.W. attends school, watches television, and does his homework and chores on a daily basis.  (Tr. 98).  When he is not in school, he rides his bike or plays with neighborhood children.  (*Id.*).  Plaintiff reported that A.B.W. played basketball and baseball in the past but stopped because "his chest would start hurting."  (*Id.*).  She also said that A.B.W. sometimes gets in arguments with neighborhood children because they are very active and "he can't do the things they do."  (*Id.*).  A.B.W. was described as very "hardheaded"; he often talks back to his mother and has difficulty getting along with his sisters.  (*Id.*).  Plaintiff indicated that A.B.W. is "always getting into fights," and has been caught stealing from stores.  (*Id.*).  He has difficulty in school because he does not pay attention, talks back to the teacher, and plays around too much in class.  (*Id.*).  According to Plaintiff, A.B.W. receives detention or a suspension "every other week."  (*Id.*).  He misses a lot of school for these reasons (and because he oversleeps).  (Tr. 99).  A.B.W. performs chores at home – including cleaning the kitchen, cleaning his room, and yard work – but he needs reminders and supervision.  (*Id.*).

In an undated disability appeals report, Plaintiff reported that A.B.W.'s condition had worsened since the time of his last report.  (Tr. 116).  Beginning in approximately June of 2009, A.B.W. had been "getting violent," "having a lot of anger problems," and "doing bad things like stealing because people tell him to."  (*Id.*).  A.B.W. had been continuing to treat at Children's Hospital of Michigan for "breathing problems," and he needed to schedule a sleep study.  (Tr. 117).  He continued to use a "breathing machine" for sleep apnea, and he was taking fluticasone

3

for "ear and nose problems."  (Tr. 118).

In a June 11, 2010, disability appeals report, Plaintiff reported that, in October of 2009, A.B.W. had been hospitalized, diagnosed with bipolar disorder and major depression, and prescribed Concerta and Abilify.  (Tr. 124).  She further indicated that A.B.W. could not function without his medication, could not stay awake, and could not be left alone with his siblings because he was violent.  (*Id.*).  He had been seeing one doctor for therapy and counseling and another for medication and treatment.  (Tr. 125-26).

### 2.   *The August 4, 2010 Hearing Before the ALJ*

At the August 4, 2010 hearing before the ALJ, A.B.W., then fourteen years old, testified that he was in the ninth grade and was taking "regular classes" (as opposed to special education classes).  (Tr. 43, 62-63).  When asked what grades he got in school, A.B.W. indicated that he received mostly C's and D's, along with "one or two B's," and an F.  (Tr. 43-44).  However, he successfully completed a three-week long extra class to raise his math grade.  (Tr. 46-47).

A.B.W. testified that he had been suspended from school "a lot" of times ("every other week") for being disrespectful to teachers, refusing to follow directions, talking, playing, misusing computers, and arguing and fighting with other children.[1]  (Tr. 44-45).  A.B.W. does his homework "most of the time," although he is easily distracted.  (Tr. 45).  A.B.W. testified that he takes medication to help him stay focused, but he cannot tell if it helps.  (*Id.*).  Plaintiff indicated, however, that when A.B.W. takes the medication regularly, it does help.  (Tr. 46).

A.B.W. testified that he plays football, basketball, and baseball with other children in the neighborhood.  (Tr. 49).  Primarily, however, he stays in his house, watching television and eating junk food all day long.  (Tr. 51-52).  He performs his chores, including cleaning his

---

[1] School records indicate that, between January 2010 and May 2010, A.B.W. was suspended four times and received five detentions.  (Tr. 208-09).

4

bedroom, the bathroom, and the living room, with his mother's supervision.  (Tr. 53).  He has to be instructed multiple times to get ready for school in the morning (i.e., reminded to get dressed, take a shower, turn off the television, etc.).  (Tr. 60).

Plaintiff testified that A.B.W. "talks back" to her, argues with her, curses at her, and tells her to "shut up."  (Tr. 53).  Plaintiff also testified that A.B.W. is aggressive with his sisters:  on one occasion, he hit his four-year-old sister because he thought she wrote on the wall; on another occasion, he tried to hit his older sister with a baseball bat.  (Tr. 54).  One day, A.B.W. walked out of the house, dressed only in shorts, and was found by the police sleeping in a car outside a mall.  (Tr. 57).  Plaintiff testified that she began to suspect A.B.W. was on drugs because he could not dress himself and became violent with his father.  (Tr. 58).  Eventually, Plaintiff took A.B.W. to a hospital, where he was admitted and treated for several days.  (Tr. 54-55).  Since that time, A.B.W. has not been as aggressive with his sisters, although Plaintiff testified that he is "just always angry."  (Tr. 55).

Plaintiff also testified that although A.B.W. is still supposed to sleep with the CPAP machine, he does not use it every night.  (Tr. 61).  A.B.W. indicated that he does not like to sleep with the CPAP mask on because it is "uncomfortable."  (*Id.*).  When asked about his hearing loss, A.B.W. denied having any hearing problems, saying that he can hear "okay."  (Tr. 62).

3.     *Medical Evidence*

In December of 2008, A.B.W. had an audiology test at Children's Hospital of Michigan, which showed normal to mild hearing loss in his left ear and moderate hearing loss in his right ear.  (Tr. 146-47).  In January of 2009, A.B.W. was re-tested, and a note from Michigan Pediatric ENT Associates indicates that he has bilateral conductive hearing loss, right greater than left, and

preferential seating was recommended.[2]  (Tr. 138-39).

In December of 2008, A.B.W. underwent a sleep study at Children's Hospital of Michigan.  The study showed that A.B.W., who is morbidly obese, has obstructive sleep apnea and snoring.  (Tr. 149).  A.B.W.'s physician instructed him to lose weight and prescribed a CPAP machine.  (Tr. 140).  At a follow-up visit in March of 2009, A.B.W. complained that he was having difficulty using his CPAP mask and had not been using the machine.  (Tr. 150).  A physical examination revealed normal chest expansion, normal respiratory effort, and normal muscle strength and tone.  (Tr. 151).  A.B.W. was alert and oriented with normal recent and remote memory, no gross focal neurologic deficits, and no cranial nerve deficits.  (*Id.*). A.B.W.'s physician instructed him to use his CPAP machine; indeed, the physician noted that "[m]ore than 50% of the time span during this consult was spent counseling [] the mother and patient on CPAP use."  (*Id.*).

On May 30, 2009, A.W.B. underwent a consultative examination with Sandra Coutu, LLP, in conjunction with his application for disability benefits.  (Tr. 165-69).  At that time, Dr. Coutu noted that A.B.W. was not taking any medications and had never received mental health services.  (Tr. 166).  At the start of the mental status examination, Dr. Coutu noted that A.B.W. was "superficially cooperative and put forth a fair effort."  (Tr. 167).  However, his affect was very flat and he responded only when he was asked questions.  (*Id.*).  According to Dr. Coutu, "He maintained marginal eye contact and required a great deal of encouragement to respond and pay attention to the task.  He has a good memory and verbal skills and appeared able to communicate with adults appropriately."  (*Id.*).

Dr. Coutu further noted that A.B.W.'s "prevailing mood appeared inappropriate to

---

[2]  Apparently, Plaintiff never contacted the school regarding A.B.W.'s hearing loss, so no accommodations were made.  (Tr. 163).

circumstance." (*Id.*).  He became "visibly irritated" when Plaintiff talked about "his stealing, numerous lies, and an inability to get along with others." (*Id.*).  He exhibited no evidence of delusions or a thought disorder, no signs of auditory or visual hallucinations, and demonstrated fair judgment and problem-solving skills for a child his age. (*Id.*).  He did not know the correct day, date, or month, but he knew the year. (Tr. 168).  He could recall four numbers forward and four numbers backward. (*Id.*).  He was unable to perform age appropriate addition and subtraction problems, but he could count to 100 by 5's and 10's with help. (*Id.*).  Dr. Coutu diagnosed A.B.W. with oppositional defiant disorder ("ODD"), assigned him a Global Assessment of Functioning ("GAF")[3] score of 60, and described his prognosis as "guarded, even with treatment." (Tr. 169).  In summary, Dr. Coutu said:

> [A.B.W.] has difficulty interacting in a socially appropriate manner.  His frequent mood disruptions and inability to focus and concentrate make him difficult to deal with in a classroom situation.  Claimant is recommended to seek psychiatric evaluation.  No additional information accompanied him but mother stated his grades are "okay" and his main problems appear to be behavioral.  He can follow directions and complete tasks but he requires supervision and most often one-on-one guidance.

(*Id.*).

On June 20, 2009, a Childhood Disability Evaluation form was completed by state agency medical consultants Dr. Muhammad Khalid and Dr. Daniel Blake. (Tr. 171-76).  Dr. Khalid and Dr. Blake concluded that A.B.W. has "less than marked" limitations in attending and completing tasks, interacting and relating with others, caring for himself, and health and physical well-being; and "no limitation" in acquiring and using information and moving about and manipulating objects. (Tr. 173-74).

---

[3] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

Approximately four months later, on October 11, 2009, A.B.W. was admitted to Behavioral Centers of America ("BCA") after verbalizing hallucinations.[4]  (Tr. 195).  At his initial psychiatric evaluation, Dr. Sanjeev Venkataraman noted that A.B.W. had not been taking any medications and had no history of psychiatric treatment.  (Tr. 204).  A.B.W. reported "that he hears voices that tell him to do different things at different times" and that the voices interfere with his sleep and his activities.  (*Id.*).  Plaintiff believed that A.B.W.'s symptoms were substance abuse related, but A.B.W. denied using illegal substances (except admitting that he took one pill from a man on one occasion).[5]  (Tr. 195, 204).  A mental status examination revealed that A.B.W. was alert and fully oriented, with a constricted affect and depressed mood, as well as marked low self-esteem with suicidal ideations.  (Tr. 204).  He was diagnosed with psychotic disorder, not otherwise specified, attention deficit hyperactivity disorder ("ADHD"), and ODD, and assigned a GAF score of 20.  (Tr. 205).

Over the course of the eight days he remained inpatient at BCA, A.B.W. was stabilized on Concerta and Abilify.  (Tr. 195).  A.B.W.'s psychosis improved, and at the time of his discharge, he was free of any suicidal or homicidal ideations, thoughts, or plans, and was "motivated for continued outpatient treatment."  (*Id.*).  A.B.W's diagnoses on discharge were psychotic disorder, not otherwise specified, ADHD, and parent-child problems, and his GAF score had improved to 50.  (Tr. 196).  Dr. Venkataraman instructed A.B.W. to abstain from the use of all mood altering chemicals, to taper off Abilify as tolerated, and to follow up with Eastwood Clinic for outpatient treatment on October 26, 2009.  (Tr. 196-97).

---

[4] Psychiatric notes from Eastwood Clinic (where A.B.W. subsequently sought treatment) indicate that he was hospitalized after fighting with his older and younger sisters.  (Tr. 190).  Specifically, A.B.W. claimed that his younger sister wrote on the wall and then "whipped her."  (*Id.*).  According to Plaintiff, A.B.W. also tried to hit his older sister with a baseball bat.  (Tr. 54).

[5] A.B.W.'s blood tests and urine drug screen were within normal limits.  (Tr. 195).

A.B.W. did not follow up with Eastwood Clinic until March 25, 2010, when he had a psychiatric evaluation. (Tr. 190-93). At that time, A.B.W. denied using drugs but later admitted that he had smoked marijuana with his older sister. (Tr. 191). Upon mental examination, A.B.W. was alert and fully oriented. (Tr. 192). He was underproductive, with no continuous thoughts, and poor insight and judgment. (*Id.*). A.B.W. was diagnosed with bipolar disorder and possible ODD and assigned a GAF score of 30. (Tr. 193).

At a follow-up visit in April of 2010, Plaintiff reported that A.B.W. did not take his prescribed medication all the time, was getting "horrific" grades, and was in detention at school. (Tr. 186). His Concerta dose was increased, and his Abilify was decreased. (*Id.*). In May of 2010, A.B.W. reported that he liked the Concerta because it kept him awake and gave him energy. (Tr. 187). His grades had improved, he was sleeping better at night, and his temper was better. (*Id.*). During his last documented visit at Eastwood Clinic, Plaintiff reported that A.B.W. "likes pain," still has mood swings, and has no energy to do anything other than eat and sleep. (Tr. 185). The record does not contain any further documented treatment.

### 4. School Records and Evaluations

A "teacher questionnaire" was completed in April of 2009 by A.B.W.'s math and science teacher, Caree Finazza, and the school counselor, Lisa Shepard. (Tr. 157-64). Based on their observations, Ms. Finazza and Ms. Shepard opined that A.B.W. has problems with attending and completing tasks; specifically, A.B.W. has an "obvious problem" focusing long enough to finish an assigned activity or task and completing class/homework assignments, and he has a slight problem in several other areas. (Tr. 159). In the domain of interacting and relating with others, they opined that A.B.W. has a "slight problem" with seeking attention appropriately, expressing anger appropriately, using language appropriate to the situation and listener, taking turns in a

9

conversation, and using adequate vocabulary and grammar, but he has no problems in the remaining areas.  (Tr. 160).  The teachers further stated that A.W.B. is "very social" and many times is "distracted due to socialization."  (*Id.*).  They opined that A.W.B. has no problems in the domains of acquiring and using information, moving about and manipulating objects, and caring for himself.  (Tr. 158, 161-62).

Ms. Finazza and Ms. Shepard further noted that A.B.W. has an unusual degree of absenteeism; some of his absences were the result of his frequent suspensions, but others were "unverified."  (Tr. 157).  In closing, they wrote:  "[A.B.W.] is a capable young man academically and his grades have improved.  His behavior and attendance are the problem.  [A.B.W.] seems to engage in inappropriate behavior for social attention."  (Tr. 164).

### C.    Framework for Child Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §1382c(a)(3)(C)(i).  The Social Security regulations set forth a sequential three-step process for determining children's disability claims:  first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *See* 20 C.F.R. §416.924(a).

To "meet" a listed impairment, a child must demonstrate both the "A" and "B" criteria of the impairment.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder"

10

whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment does not "meet" a listed impairment, the impairment may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. *See* 20 C.F.R. §416.926a. "Medical equivalency is covered by 20 C.F.R. §416.926; functional equivalency is covered by Section 416.926a." *Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003).

"To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, 2009 WL 1741375, at *8 (S.D. Ohio June 18, 2009) (citing 20 C.F.R. §416.926(a)). A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;
>
> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or
>
> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Evans ex rel. DCB v. Comm'r of Soc. Sec.*, 2012 WL 3112415, at *6 (E.D. Mich. Mar. 21, 2012) (quoting *Koepp v. Astrue*, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011)); *see also* 20

11

C.F.R. §416.926.  "The essence of these subsections is that strict conformity with the Listing Requirements is not necessarily required for a finding of disability.  If a plaintiff is only able to demonstrate most of the requirements for a Listing or if he or she is able to demonstrate analogous or similar impairments to the impairments of a Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show impairments of equal medical significance." *Evans*, 2012 WL 3112415, at *7 (quoting *Emeonye v. Astrue*, 2008 WL 1990822, at *4 (N.D. Cal. May 5, 2008)).

Regarding functional equivalence, there are six "domains" that an ALJ considers:  (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being.  *See* 20 C.F.R. §416.926a.  Functional equivalence to a listed impairment exists when the child has an "extreme" limitation in one of the six domains or "marked" limitations" in two of the six.  *See* 20 C.F.R. §416.926a(d).  An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities.  *See* 20 C.F.R. §416.926a(e)(3)(i).  A "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities.  *See* 20 C.F.R. §416.926a(e)(2)(i).

### D.    The ALJ's Findings

At step one, the ALJ found that A.B.W. has not engaged in substantial gainful activity since February 27, 2009, the application date.  (Tr. 14).  At step two, the ALJ found that A.B.W. has the following severe impairments:  ODD, obstructive sleep apnea, obesity, and mild hearing loss.  (*Id.*).  At step three, the ALJ concluded that these impairments do not meet or medically equal a listed impairment.  (Tr. 16).  The ALJ also found that A.B.W.'s impairments do not

functionally equal any listing because he has "less than marked" limitations in the domains of "attending and completing tasks," "interacting and relating with others," "caring for himself," and "health and physical well-being," and no limitations in the remaining domains.  (Tr. 17-23).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13;

13

*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001); *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

#### 1.    *Substantial Evidence Supports the ALJ's Conclusion that A.B.W. Does Not Have an Impairment that Meets or Medically Equals a Listing*

As set forth above, the ALJ found that A.B.W. has the severe impairments of ODD, obstructive sleep apnea, obesity, and mild hearing loss. (Tr. 14-16). He then concluded that none of A.B.W.'s impairments meet or medically equal Listings 2.00, 3.00, 12.00, or any other listing. (*Id.*). Plaintiff appears to challenge this conclusion.

In order for a claimant "to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). The findings necessary to satisfy a listing must be determined on the basis of objective observations during an examination, not merely a report of an individual's alleged symptoms. *See* 20 C.F.R. §416.908 ("A physical or mental impairment must be established by medical

14

evidence consisting of signs, symptoms, and laboratory findings, not only your statements of symptoms.").

In this case, the ALJ explained that he "evaluated the signs, symptoms, and laboratory findings of the claimant's severe impairments," and found that they do not meet or medically equal in severity or duration the criteria of Listings 2.00, 3.00, 12.00, or any other listing.  (Tr. 16).  In the pages both preceding and following this conclusion, the ALJ conducted a thorough review of the medical evidence, all of which supports his conclusion.  (Tr. 14-23).  *See Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (holding that, where the ALJ described evidence pertaining to the claimant's impairments earlier in his opinion, his limited explanation of the "meets or medically equals" prong was sufficient).  Plaintiff has pointed to no specific medical evidence establishing that A.B.W.'s impairments meet or medically equal the criteria of any listing, and no medical source has expressed such an opinion.  (Tr. 137-210).  In fact, the opinions of the state reviewing physician, Dr. Khalid, and the state reviewing psychologist, Dr. Blake, are consistent with the ALJ's finding.  (Tr. 171-72).  *See Soc. Sec. Rul.* 96-6p, 1996 WL 374180, at *2 (July 2, 1996) (state agency physician and psychological consultants are considered experts in evaluating disability issues).  Thus, the ALJ's conclusion that A.B.W.'s severe impairments do not meet or medically equal a listed impairment is supported by substantial evidence.

        2.    *Substantial Evidence Supports the ALJ's Conclusion that A.B.W.'s Impairments Do Not Functionally Equal a Listing*

The ALJ also appropriately determined that A.B.W.'s impairments do not functionally equal a listing.  (Tr. 17-23).  In order to establish functional equivalence, A.B.W. must show marked limitations in two domains of functioning, or an extreme limitation in one domain.  *See* 20 C.F.R. §416.926a(d).  After reviewing the medical and other record evidence, reports, and

hearing testimony, the ALJ found that A.B.W. has "less than marked" limitations in the domains of attending and completing tasks, interacting and relating with others, caring for himself, and health and physical well-being.  (Tr. 17-23).  The ALJ found no limitation in the domains of acquiring and using information and moving about and manipulating objects.  (Tr. 18-19, 21).

Plaintiff argues that A.B.W. has a marked limitation in the domain of acquiring and using information and an extreme limitation in the domain of interacting and relating with others.[6] (Doc. #13 at 12-14).  In order for a limitation to be considered "marked," the child's impairments must interfere "seriously" with his ability to independently initiate, sustain, or complete activities.  *See* 20 C.F.R. §416.926a(e)(2)(i).  A "marked" limitation also means a limitation that is "more than moderate" but "less than extreme."  *Id.*  In order for a limitation to be considered "extreme," the child's impairments must interfere "very seriously" with the ability to independently initiate, sustain, or complete activities.  *See* 20 C.F.R. §416.926a(e)(3)(i).  An extreme limitation is the rating given to "the worst limitations."  *Id.*

> a.   *Substantial Evidence Supports the ALJ's Finding of Less Than Marked Limitation in Acquiring and Using Information*

The domain of acquiring and using information addresses how well a child acquires or learns information, and how well he uses the information he has learned.  *See* 20 C.F.R. §416.926a(g).   An adolescent (age 12 to attainment of age 18) should (1) continue to demonstrate in middle school and high school what he has learned in academic assignments; (2) be able to use what he has learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation); (3) be able to comprehend and express both simple and complex ideas, using increasingly complex language, in learning and daily living situations; and (4) apply these skills in practical ways that will help in entering the

---

[6] Plaintiff does not challenge the ALJ's conclusions with respect to the other four domains.

workplace after school is finished. *See* 20 C.F.R. §416.926a(g)(2)(v). Examples of limited functioning in this domain include difficulty recalling important things learned in school previously; difficulty solving math problems; or talking only in short, simple sentences, with difficulty explaining what is meant. *See* 20 C.F.R. §416.926a(g)(3).

Contrary to Plaintiff's assertion, the ALJ did not "totally rel[y] on only the note [in which] the teacher indicated that [A.B.W.] had no problems in his ability to acquire and use information." (Doc. #13 at 12). To be sure, the ALJ properly discussed the "teacher questionnaire" completed by Ms. Finazza and Ms. Shepard, noting the fact that they opined that A.B.W. has "no problems" in the area of acquiring and using information. (Tr. 14, 19, citing Tr. 158). Significantly, as the ALJ discussed, these teachers reported that A.B.W. is "a capable young man academically and his grades have improved." (Tr. 14, citing Tr. 164).

However, that is not the only evidence on which the ALJ based his conclusion. For example, he noted that the documentary evidence presented does not suggest any problems in this domain. (Tr. 19). And, as the ALJ recognized, A.B.W. testified that his grades were improving and he was getting ready to begin his first year of high school. (Tr. 16, 43, 46-47). He had successfully completed an extra math class to raise his grade. (Tr. 46-47). Thus, although A.B.W. was not an A student, he attended "regular" classes (as opposed to special education classes) and received passing grades. Moreover, the state agency reviewing psychologist opined that A.B.W. has no limitation in the domain of acquiring and using information. (Tr. 173).

Finally, in finding A.B.W.'s limitation "less than marked" in this domain, the ALJ specifically noted that he "has not alleged any limitation in this domain." (Tr. 19). A review of A.B.W.'s disability application reveals that he alleged disability due to sleep apnea, hearing loss,

and behavioral problems; he did not allege disability due to any inability to acquire or use information.  (Tr. 106).  Moreover, Plaintiff did not assert in her brief to the Appeals Council that the ALJ erred in concluding that A.B.W. has a less than marked limitation in this domain. (Tr. 135-36).  In sum, substantial evidence supports the ALJ's conclusion that A.B.W. has a less than marked limitation in the domain of acquiring and using information.

> b.   *Substantial Evidence Supports the ALJ's Finding of Less Than Marked Limitation in Interacting and Relating with Others*

The domain of interacting and relating with others addresses how well the child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others.  *See* 20 C.F.R. §416.926a(i).  An adolescent should be able to initiate and develop friendships with other children and relate appropriately to other children and adults; solve conflicts with peers, family members, or adults; and intelligibly express feelings, ask for assistance in getting needs met, seek information, describe events, and tell stories in all kinds of environments and with all types of people.  *See* 20 C.F.R. §416.926a(i)(2)(v).  Examples of limited functioning in this domain include individuals who have no close friends, who avoid or withdraw from people they know, who are overly anxious or fearful of meeting new people or trying new experiences, who have difficulty playing games or sports with rules, who have difficulty communicating with others, or who have difficulty speaking intelligibly or with adequate fluency.  *See* 20 C.F.R. §416.926a(i)(3).

Plaintiff argues that A.B.W. has an "extreme" limitation in the domain of interacting and relating with others, asserting that he "indicate[s] no friends, and he attacks his siblings with baseball bats … [and] is confrontational with both parents and grandparent."  (Doc. #13 at 13-14).  As an initial matter, there is no evidence in the record that A.B.W. became confrontational

18

or violent with a grandparent. Moreover, contrary to Plaintiff's assertion that he has "no friends," A.B.W. testified that he has friends and plays with children in the neighborhood. (Tr. 48-49). This was consistent with a March 23, 2009 daily activities report, in which Plaintiff indicated that A.B.W. plays with neighborhood children and had participated in team sports. (Tr. 98).

In reviewing the evidence pertaining to A.B.W.'s functioning in this domain, the ALJ considered the reports of school suspensions and detentions due to disrespectful behavior, as well as the fact that A.B.W. fought with his sisters. (Tr. 20). However, the ALJ also mentioned some of A.B.W.'s positive social interactions, including the fact that he played organized sports such as football and basketball.[7] (*Id.*). To the extent that A.B.W. has difficulty playing with other children, Plaintiff reported that this is because other children are "very active" and "he can't do the things they do." (Tr. 98).

In addition, there is other evidence cited by the ALJ in his decision that belies a conclusion that A.B.W. has an extreme limitation in the domain of interacting and relating with others. For example, A.B.W.'s teacher reported that he has only a slight problem in this domain and does not require any behavior modification strategies. (Tr. 160). She characterized A.B.W. as "very social" and indicated that he is often distracted due to his socializing. (*Id.*). She also indicated that almost all of his speech can be understood. (Tr. 161). Moreover, the state agency psychologist concluded, after reviewing A.B.W.'s records, that he has a less than marked limitation in this domain. (Tr. 173).

In sum, substantial evidence supports the ALJ's finding of a less than marked limitation in the domain of interacting and relating with others.

---

[7] Although A.B.W. stopped playing basketball in 2009, he did so due to chest pain, not due to any problems interacting and relating with others. (Tr. 98).

3.      *The ALJ Considered Dr. Coutu's Opinion and Any Error
Made in Failing to Explicitly Weigh His Opinion Was Harmless*

Plaintiff also argues that the ALJ erred in failing to give proper weight to the opinion of the consultative examiner, Dr. Coutu. (Doc. #13 at 14). Specifically, Plaintiff appears to suggest that the ALJ was required to explicitly state the weight he gave this opinion. (*Id.*). As the Commissioner correctly points out, however, the applicable regulations provide only that the opinion of a *treating source* must be weighed, and that such an opinion may be entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §416.927(c)(2). The regulations further provide that the ALJ must give "good reasons" for the weight given to a treating source's opinion. *Id.* In this case, however, the ALJ did not fail to weigh or give controlling weight to a treating physician's opinion; the ALJ merely did not explicitly weigh a consultative examiner's opinion. (Tr. 15). Thus, the ALJ did not err in failing to explicitly set forth the weight he gave to Dr. Coutu's opinion. *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 490 (6th Cir. 2005) ("The ALJ's failure to specifically address Dr. Pinson's opinion … is not surprising given that Dr. Pinson does not meet the criteria under the regulations to be defined as a treating physician.").

Moreover, the ALJ did not – as Plaintiff asserts – err in "ignoring the diagnosis given by Dr. Coutu …." (Doc. #13 at 14). Rather, the ALJ appears to have given great weight to Dr. Coutu's diagnosis of ODD, as he specifically found that A.B.W. suffers from this impairment. (Tr. 14, 169). In addition, Dr. Coutu opined that A.B.W. "has difficulty interacting in a socially appropriate manner" and demonstrates an "inability to focus and concentrate," but can follow directions and complete tasks with supervision. (Tr. 169). Thus, where the ALJ concluded that A.B.W. has less than marked limitations in the domains of attending and completing tasks and

20

interacting and relating with others, his conclusions are generally consistent with Dr. Coutu's opinion of A.B.W.'s overall abilities.

In any event, to the extent the ALJ erred in failing to explicitly weigh Dr. Coutu's opinion, such error is harmless. *See Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 468 (6th Cir. 2005). The fundamental question is whether the ALJ's decision is supported by substantial evidence. *Id.* (citing *Heston*, 245 F.3d at 535-36)). Here, where the record contains ample evidence supporting the ALJ's conclusion that A.B.W. is not disabled, neither reversal nor remand is warranted.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Plaintiff's Motion for Summary Judgment [13] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: June 17, 2013                    s/David R. Grand
Ann Arbor, Michigan                     DAVID R. GRAND
                                        United States Magistrate Judge

### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to

E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 17, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

22